# In the United States Court of Federal Claims

No. 11-519C
(Filed Under Seal: March 22, 2012)
(Reissued: March 29, 2012)[1]
(Bid Protest)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| GUZAR MIRBACHAKOT | * | **Bid Protest; Rejection of Late** |
| TRANSPORTATION, | * | **Proposal; Electronic Submission** |
| | * | **of Proposals; Interpretation of** |
| Plaintiff, | * | **Solicitation; Zip Files; Expert** |
| | * | **Testimony; Notice of Proposed** |
| v. | * | **Debarment; Bid & Proposal** |
| | * | **Preparation Costs; Injunctive** |
| | * | **Relief.** |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Timothy Sullivan, Thompson Coburn, LLP, 1909 K Street, NW, Washington, D.C., for Plaintiff. Katherine Nucci and Scott Lane, Thompson Coburn, LLP, 1909 K Street, NW, Washington, D.C., of Counsel.

Tony West, Jeanne E. Davidson, Kirk T. Manhardt, and Sarah M. Bienkowski, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant. Scott N. Flesch and Bernal Rodriguez, U.S. Army Contract & Fiscal Law Division, Washington, D.C., of Counsel.

---

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND ENTERING INJUNCTION

---

**WILLIAMS**, Judge.

---

[1] This opinion was issued under seal on March 22, 2012. The Court invited the parties to submit proposed redactions by March 28, 2012. The opinion issued today incorporates the Plaintiff's redactions, errata corrected. Redacted material is represented by brackets **[ ]**.

In this post-award bid protest, involving multiple awards for trucking services in Afghanistan, Guzar Mirbachakot Transportation ("GMT") challenges the Department of the Army's failure to evaluate portions of its proposal on the ground that they were late.  GMT claims that its entire proposal was submitted on time via e-mail using zip files and that the Army incorrectly interpreted the solicitation to prohibit this manner of transmission.

Upon consideration of the Administrative Record ("AR"), and the entire record herein, the Court concludes that the solicitation did not prohibit transmission via zip files and the Army's failure to evaluate GMT's full proposal, which was timely received in zip files, was arbitrary and capricious.  As such, the Court enters an injunction directing the Army to evaluate GMT's full proposal and consider that proposal for an award.  The Court also awards GMT limited bid and proposal preparation costs that were wasted due to GMT reorganizing and retransmitting its proposal eliminating zip files.

## Findings of Fact[2]

### The Solicitation for NAT Services

On February 22, 2011, the Army issued solicitation number W91B4N-11-R-5000 for National Afghan Trucking ("NAT") services in Afghanistan.  AR 141.  The purpose of the NAT contract was to provide a secure and reliable means of distributing reconstruction material, security equipment, fuel, miscellaneous dry cargo, and life support assets to forward operating bases and distribution sites throughout the combined joint operations area in Afghanistan.  AR 1167.  The Army anticipated the award of indefinite delivery/indefinite quantity contracts for trucking services in three suites: Suite 1, for bulk fuel; Suite 2, for dry cargo; and Suite 3, for heavy cargo.  Id.  Contracts for each suite had a base term of one year and two one-year options. AR 1067-68.  The NAT procurement was essentially a follow-on procurement to the Host Nation Trucking ("HNT") contract, which had covered substantially the same mission requirements. Pl.'s Mot. for J. on the AR 7-8.

There were three amendments to the solicitation.  Amendment 0001, issued on March 13, 2011, extended the due date for receipt of proposals to April 8, 2011, 4:00 p.m. Afghanistan time ("AFT") and incorporated Questions & Answers 31 through 193.  AR 245-46.  Amendment 0002, issued on March 24, 2011, incorporated Questions & Answers 194 through 294.  AR 425-26.  Amendment 0003, issued on March 31, 2011, incorporated Questions & Answers 295 through 412.  AR 1061-62.

### The Solicitation's Requirements for Electronic Proposal Submissions

The solicitation contained nine pages of proposal preparation and submission instructions.  AR 1131-40.  The Army instructed Offerors to submit proposals in four volumes --

---

[2]  These findings of fact are derived from the AR, expert testimony received at trial, and the declarations of Plaintiff's proposal manager, David Evans, and the contracting officer, Dale E. Van Dyke.

Contract Documents, Volume I, and Technical Capabilities for each of the three Suites, Volumes II-IV.  AR 1131-32.  The majority of the proposal submission instructions delineated which proposal documents should be placed in the respective volumes.  AR 1133-40.

Only two paragraphs discussed electronic proposal submission requirements.  First, under a paragraph titled "Proposal Format," the solicitation stated: "The contractors shall submit an original and redacted copy of their complete proposal.  Proposals may be submitted in hard copy (mail, in-person, etc.) or via e-mail to the Contracting Officer."  AR 1132.  The solicitation continued:

> Offerors are reminded of the current operating environment in Afghanistan. Offerors are reminded that internet and e-mail availability is intermittent.  If the proposal is submitted via e-mail, it is the [offeror's] responsibility to obtain written acknowledgement from the contracting officer that the proposal has been received by the Government prior to the date and time specified in the solicitation for the receipt of proposals. . . . It is the Offeror's sole responsibility to ensure the proposal submission is received at the BRCC [Bagram Regional Contracting Center] prior to the date and time specified for receipt of proposals, regardless of the method of submission.  All proposals, regardless of the method of submission, received after the date and time specified in the solicitation will be treated as a late proposal.

AR 1132.

> The solicitation further stated the requirements for electronic proposals as follows:
>
> If the proposal is submitted via electronic means, files shall be Microsoft Office 2003 (Word and/or Excel) or PDF format only.  Each volume shall be organized and formatted so that an extensive search of the proposal is not necessary to perform an evaluation.  Each volume shall contain a separate "Table of Contents" that identifies all paragraphs and subparagraphs covered within that volume of the proposal by paragraph and subparagraph number, title and by page number. . . . All computer files shall be virus checked prior to submission.  Offerors may be held financially liable for damage caused to USG computer systems by any virus introduced during review of these submitted documents.

AR 1132 (emphasis added).

The only other guidance for electronic proposal submissions was contained in the Questions and Answers incorporated in the solicitation.  Answers advised offerors of the correct e-mail address for transmission of proposals, instructed that the Government's e-mail system would not accept password-protected documents, and advised that both hard and e-mail copies of the proposal could be submitted but the Army would evaluate the last proposal received before the deadline.  AR 383-84, 1203, 1206.  In response to a question whether the military e-mail system had capability to receive e-mails with "more than 5 megabytes of size," the Government responded: "it will be the Offeror's responsibility to ensure proposal transmissions are received

by the USG [United States Government] by the due date and time specified in the solicitation. The USG recommends that electronic file size(s) do not exceed 5MB." AR 395. There were no additional requirements for the electronic submission of proposals.

**The NAT Procurement Process**

The procurement was to be conducted in accordance with FAR 15.101-2 as a Lowest Price Technically Acceptable ("LPTA") procurement. AR 1142. The first step in the LPTA process was a responsiveness evaluation. AR 1143. The solicitation contained strict requirements regarding responsiveness, stating:

> f.      All proposals will be evaluated for responsiveness to the solicitation. Failure of an offeror's proposal to meet any requirement of the RFP may result in the entire proposal being found nonresponsive and eliminated from further competition. The PCO will, prior to any evaluation by the SSEB, verify that each proposal meets the requirements of the solicitation for the purpose of determining responsiveness. Verification will include, but is not limited to, the following:
>
>> 1) The Offeror's proposal was not a Late Proposal
>> 2) Submission of Volume I – Contract Documents which complies with all Instructions to Offerors
>> 3) Submission of Volume II – Technical Capability, Suite 1 Bulk Fuels which complies with all Instructions to Offerors (Required if Volume I – Contract Documents, Section B indicates the proposal is being submitted in response to Suite 1)
>> 4) Submission of Volume III – Technical Capability, Suite 2 Dry Cargo which complies with all Instructions to Offerors (Required if Volume I – Contract Documents, Section B indicates the proposal is being submitted in response to Suite 2)
>> 5) Submission of Volume IV – Technical Capability, Suite 3 Heavy Cargo which complies with all Instructions to Offerors (Required if Volume I – Contract Documents, Section B indicates the proposal is being submitted in response to Suite 3)

AR 1143.

Once a proposal was deemed responsive to the solicitation, the Army planned to evaluate it under two factors -- technical capability and price. Id. There were six technical subfactors:

Subfactor 1A: Minimum number of assets
Subfactor 1B: Fully operational In Transit Visibility (ITV) solution
Subfactor 1C: 24 Hour Operations Center
Subfactor 1D: Provide key personnel
Subfactor 1E: Private Security Company (PSC) services
Subfactor 1F: Contractor management plan

AR 1144-45.  Proposals were to be scored as either "acceptable" or "unacceptable" for each subfactor.  AR 1143.  An acceptable rating indicated the offeror passed or met the minimum mandatory requirement, while an unacceptable rating indicated the offeror failed to meet the minimum mandatory requirements.  Id.

Only technically acceptable proposals would be evaluated for price.  The price evaluation assessed whether an offeror's unit prices were fair, reasonable, and balanced.  See FAR 15.404-1(b).  The solicitation did not list past performance as a separate evaluation factor but included past performance as an element of the responsibility determination.  AR 1146.  Only if the unit prices, option prices, and total evaluated price were deemed "fair, reasonable, and balanced," would the Army evaluate an offeror for responsibility.  AR 1145.

The Army planned to repeat the process until it identified approximately 10 to 14 awards under each suite.  AR 1146.  While the Army intended to evaluate proposals and make awards without discussions, it reserved the right to conduct discussions, establish a competitive range, and allow offerors to furnish revised proposals.  AR 1146-47.

**Submission of GMT's Proposal via E-mail**

GMT engaged a consultant, David Evans, to assist in preparing and transmitting its proposal for the NAT procurement.  Since 1985, Mr. Evans has worked as a proposal manager and technical writer on over 150 federal solicitations.  Evans Decl. (May 2, 2011) ¶ 1.

Mr. Evans explained his experience with zip files in federal procurements, stating:

> Over the past ten years, Federal agencies have steadily increased their willingness to accept electronic proposals, and I have been involved in numerous such procurements . . . .
>
> In the case of large, complex proposals, I have frequently created Zip Files, which allow the organization of files in the various sections, thus making it easier for the procuring agency to manage the proposal.  Use of Zip Files has become standard practice for Federal procurements, and most Federal customers prefer them.  Using Zip Files also allows more files to be included in each e-mail by compressing the underlying files.
>
> I have seen solicitations that prohibited the use of Zip Files, but this solicitation did not . . . .

Evans Decl. ¶¶ 2-4.

On the morning of April 8, 2011, beginning at 5:55 a.m. AFT, Mr. Evans began submitting GMT's proposal via e-mail.  AR 1224-56.  Mr. Evans explained how he transmitted the proposal as follows:

5

> [W]e submitted the GMT proposal documents in Word 2003 format and PDF
> format, as instructed.  Before sending the files, we organized them into Zip Files
> in order to minimize the risk of lost or misplaced files.  The use of Zip Files was
> also important here because the solicitation required images of various licenses,
> signed letters, and signed subcontract agreements -- necessitating very large files
> throughout the four-volume proposal. . . .

Evans Decl. ¶ 4.

Due to the warning in the solicitation concerning the intermittent availability of internet
and e-mail in Afghanistan, Mr. Evans began transmitting GMT's proposal approximately eight
hours in advance of the 4:00 p.m. AFT deadline.  Id. ¶ 5.  By 7:35 a.m. AFT, Mr. Evans had
transmitted GMT's entire proposal, including all three suites and the redacted proposal, to the
Army using compressed (zipped) files.  Id.[3]  Mr. Evans sent the proposals to two Army e-mail
addresses identified by Contracting Specialist Joseph Moonan as permissible for the electronic
submission of NAT proposals.  AR 1225-26.

That same day at 11:00 a.m. AFT, more than three hours after Mr. Evans had completed
transmission of the proposal via zip files and five hours before the deadline for receipt of
proposals, Mr. Evans received the following e-mail from Contract Specialist Moonan:

> Sir,
> We can not accept Zip files.  Please send individually.
> Joe Moonan

AR 1235.  This was the only time in Mr. Evans' over 25 years of experience in which he
encountered difficulty in transmitting compressed (zipped) files to a Federal government agency.
Evans Decl. ¶¶ 1, 4.  Further, this was the first time that a federal agency had refused to accept a
zip file submission from him.  At 12:49 p.m. AFT (4:19 a.m. ET), Mr. Evans responded "[w]e
have stripped the proposal files from the Zip Files and are currently 'sizing' the files to allow us
to e-mail….will send as soon as possible."  AR 1336.

Because the Army had recommended that e-mailed proposal submissions not exceed five
MB, Mr. Evans reorganized the proposal sections and attachments in the compressed (zipped)
files into separate e-mails with attachments that approximated five MB in size.  Mr. Evans then
resent GMT's proposal, consisting of over 100 individual Word and/or PDF files, by attaching
those files directly to several batches of e-mails.  This task required Mr. Evans to split
approximately 80 files to meet the file size requirements for transmission.

---

[3]  As Professor Gill testified, a zip file is a computer file that has been compressed using
a compression utility.  Tr. 15-16 (Sept. 19, 2011).  A zip file "is a computer representation that a
utility can take an existing document and make it smaller and then . . . uncompress it."  Id.
Unless otherwise noted, all cites to Tr. refer to the trial involving experts held on September 19,
2011.

At 12:22 p.m. AFT, the Army began receiving GMT's proposal in the resent e-mails containing individual PDF and/or Word files. AR 1261-1899. While some of these e-mails were received prior to the deadline for proposal submissions, many e-mails did not arrive until after the 4:00 p.m. AFT deadline. AR 1917-18. Between 4:06 and 5:07 p.m. AFT, the contracting officer received an additional 10 e-mails from Mr. Evans containing parts of GMT's proposal. Id.

On April 11, 2011, GMT's counsel sent an e-mail to the contracting officer inquiring as to what the Army had received from GMT. AR 1929. The contracting officer responded by attaching an e-mail providing the receipt times of 50 e-mails received on April 8, and stating that firms would be notified if their proposals were deemed late. AR 1933-46.

In an April 23, 2011 letter, the contracting officer notified GMT that "portions of GMT's proposal that were received prior to 4:00 p.m. local Afghan Time, 8 April 2011, will be evaluated" and "portions received after that time are determined to be late and, in accordance with FAR 15.208, may not be evaluated for award." AR 1958-59.

## The Initial Evaluation of Offers and Abandonment of the Solicitation's Responsiveness Criteria

In late April 2011, the Army completed the responsiveness evaluations and concluded that only five out of 93 proposals met all of the responsiveness criteria. AR 2733. The Source Selection Evaluation Board ("SSEB") Chairperson noted that the stringent responsiveness criteria produced an "insufficient number of acceptable proposals for adequate competition," and that the Army would "not [be] able to satisfy the requirement in terms of awarding 10-14 contracts per suite." Id. The SSEB recommended that the Source Selection Authority ("SSA") relax the responsiveness criteria by setting certain parameters that would eliminate proposals with material omissions, give offerors a fair opportunity, and maximize the pool of available offerors. AR 2741. The SSEB recommended the following two parameters:

Parameter 1: Complete omission of a completed Schedule B and Total Evaluated Price matrix from Volume 1 - Contract Documents, would not allow for adequate evaluation, as no prices are present and would render the offerors [ineligible] from further consideration for award.

Parameter 2: Complete omission of any information regarding proposed Assets in the corresponding Technical Capability Volume would not allow for adequate evaluation, as the Government would not be aware of the assets being proposed and would render the offerors [ineligible] from further consideration for award.

AR 2741. On April 25, 2011, the SSA endorsed the SSEB's recommendation, and on April 26, 2011, the contracting officer and the SSEB Chairperson adopted the two parameters. AR 2733-34.

Despite relaxing the solicitation's responsiveness criteria, the Army was unable to identify a sufficient number of technically acceptable proposals. See AR 3051-57. Therefore,

on May 22, 2011, the contracting officer and SSEB Chairperson eliminated the solicitation's responsiveness evaluation criteria entirely.  This abandonment of the responsiveness evaluation was done in order to promote maximum competition, meet mission needs, promote counter insurgency contracting and enhance the pool of available offerors eligible for further evaluation. Id.

**The Technical Evaluation of GMT's Proposal**

On May 31, 2011, the contracting officer informed GMT that the timely portions of GMT's proposal had been evaluated for technical acceptability, that GMT's proposal for Suite 1 was determined to be technically unacceptable, and that GMT was excluded from the competitive range.  AR 2706-07.  GMT's proposal failed to receive an "Acceptable" technical evaluation rating for Subfactors 1A, 1B, 1C, 1D, and 1E -- all of the technical subfactors but one.  AR 2708-10.  On August 5, 2011, GMT received similar notification regarding its proposals for Suites 2 and 3.  AR 2711-12, 2716-17.

**Procedural History**

On May 3, 2011, GMT filed a protest at the Government Accountability Office ("GAO").  At GAO, GMT argued that the solicitation's electronic submission requirements were latently ambiguous, rendering the Army's decision to reject GMT's proposal transmissions sent via zip folders unreasonable.  AR 129.  After the Army filed its Agency Report with GAO in early June, 2011, GMT discovered information regarding the Army's e-mail systems and network architecture, and argued that the Army servers actually received the entirety of GMT's proposal in zip files prior to the deadline for the receipt of proposals and that the entire proposal was under the Government's control prior to the deadline.  AR 2703-04.

On August 4, 2011, GAO dismissed GMT's protest as untimely because GMT was aware prior to the deadline for proposals that the Army interpreted the solicitation as prohibiting transmission of offers in zip files.  AR 2702.  GAO relied on the contract specialist's e-mail saying "We can not accept Zip files," to reach this conclusion, finding that by virtue of this e-mail, GMT learned of the Army's interpretation of the solicitation at least five hours before the deadline for submitting proposals.  AR 2703.

On August 17, 2011, GMT filed the instant bid protest seeking a temporary restraining order and preliminary injunction.  GMT argued that the solicitation instructions regarding electronic submissions were latently ambiguous, the Army's server received GMT's proposal submission via compressed (zipped) files prior to the deadline for proposals and its failure to evaluate the proposal was contrary to the solicitation and FAR 15.208, and the Army breached its duty of good faith and fair dealing because it knew its servers would strip zipped files, but failed to inform offerors.

This Court heard argument on the temporary restraining order and preliminary injunction on August 18, 2011, denied the motions in an oral ruling, and set an expedited schedule.  Tr. and Order, Aug. 18, 2011.  The Government filed the Administrative Record on August 23, 2011, and GMT filed its amended complaint on August 24, 2011.  The amended complaint included a

new count alleging disparate treatment of the offerors with respect to the responsiveness requirements of the solicitation stating:

> The Solicitation's "responsiveness" requirements included determining whether an offeror's proposal was late and whether it complied with the Solicitation instructions.  The Army waived all or many of the responsiveness requirements for some of the offerors and allowed those offerors to submit missing and otherwise deficient sections of their proposals after the deadline for receipt of offers.  GMT, however, was held strictly to the timeliness requirement within the responsiveness section.  GMT was also held strictly to the *alleged* requirement to submit proposal documents as individual Microsoft Office or PDF files.  As a result, significant portions of GMT's proposal that were submitted late as individual files or submitted timely via compressed (zipped) folders were not evaluated as part of GMT's technical acceptability.

> The Army's failure to waive the responsiveness requirements as they related to GMT, including any perceived lateness or formatting issues with respect to GMT's proposal, demonstrates that the Army treated GMT in a disparate manner, in violation of the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A) and FAR 6.101.

Am. Compl. ¶¶ 41-42.

GMT filed its Motion for Judgment on the Administrative Record on August 31, 2011, and the Government filed its Cross-Motion and Opposition on September 7, 2011.  The Court heard oral argument on the motions on September 19, 2011.  Due to the technical nature of the issues regarding the nature of compressed zip files, the Court accepted expert testimony at a trial limited to this purpose.  Order Regarding Experts, Sept. 6, 2011; Tr. 13, 75 (Sept. 19, 2011).

On September 30, 2011, the Army proposed GMT for debarment based on "evidence of false claims and forgery by GMT in its performance of trucking services under the [HNT] contract."  Def.'s Mot. to Dismiss 1.  On October 6, 2011, the Government filed a motion to dismiss this action on the ground that GMT was ineligible for award because it had been proposed for debarment.  Following a conference with the parties on October 7, 2011, the Court stayed proceedings until the resolution of GMT's debarment proceedings.  Order, Oct. 7, 2011.

On February 1, 2012, GMT notified the Court that GMT's proposed debarment had been terminated due to insufficient evidence.  Pl.'s Resp. to Def.'s Mot. to Dismiss, Attach. 1 ("SDO Letter").  In a letter advising Plaintiff and its principals that the proposed debarment had been terminated, the Army's Suspension and Debarment Official ("SDO") stated:

> Based upon my review of the present administrative record, including the written and oral submissions submitted on your behalf, I have determined that there is insufficient evidence to warrant debarment at this time.  The basis of my decision is set forth in the enclosed decision memorandum.  Accordingly, the proposal for debarment, dated September 30, 2011, is hereby terminated pursuant to FAR

9.406-1(a).  Additionally, your names . . . have been removed from the General Services Administration's Excluded Parties List System (EPLS).  Furthermore, based upon this determination, all restrictions placed upon you and your company in accordance with FAR 9.406 have been removed.

Pl.'s Resp. to Def.'s Mot. to Dismiss, Attach. 1 at 2.

Although the September 30, 2011 proposed debarment had been terminated, the SDO
[




















]

Id.

On February 14, 2012, Defendant filed a motion requesting an enlargement of time of 60 days, to and including April 17, 2012, in which to file its reply to Plaintiff's opposition to its motion to dismiss, arguing that "the debarment proceedings remain pending [

] and that it would be inefficient for the Court to continue proceedings in this action.  Def.'s Mot. for Enlargement 2-3.  Plaintiff opposed Defendant's request for an enlargement.  On February 21, 2012, the Court orally ruled that Defendant's motion to dismiss had been rendered moot by virtue of the termination of the September 30, 2011 proposed debarment.  Order, Feb. 22, 2012.

On February 22, 2012, the Government orally requested a 21-day stay of this action [                                                    ] The Court granted a briefer stay until March 7, 2012, to enable the parties to clarify [                                    ] Order Staying Case, Feb. 22, 2012.

On March 5, 2012, Defendant filed a status report stating:

[

]

On March 7, 2012, the Court held a telephonic conference with the parties, orally lifted the stay, and confirmed that the record was closed on the pending cross-motions for judgment on the AR.

## Discussion

### Jurisdiction and Standard of Review

This Court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). An interested party is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by the failure to award the contract. Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Because GMT submitted a proposal in response to the solicitation, it is an interested party with standing to bring this protest.

In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4); see also Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009). Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). If the protester succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, whether the protestor was prejudiced by that error. Id. at 1351.

### Supplementation of the Court's Record with Expert Testimony

As the United States Court of Appeals for the Federal Circuit recognized in Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1379–81 (Fed. Cir. 2009), the parties' ability to supplement the administrative record in a bid protest is limited, and the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." Courts must analyze whether supplementation is "necessary in order not to

'frustrate effective judicial review.'"  Id. at 1381 (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973)).

Effective judicial review would be impeded where technical aspects of the procurement process remain unexplained, preventing the parties from engaging in informed advocacy and the Court from developing a full judicial record and accurate context for its decision.  The Court of Federal Claims has routinely permitted supplementation of the record in a bid protest with expert testimony when necessary for the Court to understand technical or complex information involved in the challenged procurement.  See East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011); Mori Assoc., Inc. v. United States, 98 Fed. Cl. 572, 575 (2011) (noting the record may be supplemented with information generally known in an industry or discipline); Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 52, 67 (2009) (finding declarations necessary to understand the difference between "audit-supporting federal financial management system services" and "mission and administrative support IT services"); Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 272 (2004) (allowing supplementation of the record with expert testimony to "assist the Court in understanding the financing of the project"); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) (determining that supplementation was appropriate in order for the Court to understand technical solicitation language regarding "minimum production rates" for shoal dredging).[4]

This case involves the interpretation of a solicitation's requirement for electronic submission of proposals to be received via e-mail in Afghanistan.  The parties dispute whether the solicitation's mandate that e-mailed proposal files be submitted in "Microsoft Office 2003 (Word and/or Excel) or PDF format only," precluded offerors from submitting proposals in zipped or compressed files.  AR 1132.  Specifically, they contest whether compressed or zip files are a "format" that necessarily differs from "Microsoft Office 2003 (Word and/or Excel) or PDF format" or whether zip files are a protocol or utility that merely entails different packaging of the proposals without altering their underlying format.  The controversy thus centers on technical computer-related concepts and terminology.

Federal Rule of Evidence 702 permits expert testimony in precisely such a circumstance. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to

---

[4] Amplification of the record with expert testimony is not technically supplementation of the agency administrative record -- such testimony would not typically be part of an agency's procurement award record or an addendum to that record -- and is more appropriately deemed part of the Court's record.  See Rule 52.1, Rules Committee Notes ("Cases filed in this court frequently turn only in part on action taken by an administrative agency.  In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings.").  RCFC 52.1 (2006).

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Consistent with this rule, expert testimony here will assist the Court in understanding technical issues regarding the nature of electronic file formats and zip files, the Army's e-mail network architecture, and common trade practice surrounding the use of compressed or zipped files.  As such, this Court deems expert testimony to be essential for resolution of this protest and appropriate under Axiom.  The Court accepts into the record the testimony of Plaintiff's expert, Professor Christopher D. Gill, an expert in computer systems software, and Defendant's expert, Fernando L. Perez, the Chief of the Army Cyber Command Enterprise Management Division, an expert in network architecture and network defense.  Tr. 13, 72, 75.

**Defendant's Motion to Strike Portions of Professor Gill's Expert Testimony**

Prior to trial, Defendant moved to strike portions of Professor Gill's declaration and limit the scope of his testimony.  In his declaration, Professor Gill opined that the solicitation requirements regarding the use of compressed or zipped files were ambiguous, and provided what he considered "the most reasonable interpretation" of the solicitation requirements.  Gill Decl. (May 16, 2011).  The Court orally granted Defendant's request to strike in part, prohibiting Professor Gill from offering legal conclusions.  Specifically, the Court instructed Plaintiff that Professor Gill was not to render opinions as to whether there was a latent ambiguity in the solicitation, which is a legal conclusion, or whether Plaintiff's interpretation of the solicitation was reasonable in the legal sense.  Tr. 6.  However, the Court welcomed Professor Gill's testimony on custom and trade usage to aid in interpreting technical terms in the solicitation.  Id.

**Was the Solicitation Ambiguous Regarding Whether Zipped Files Could Be Used?**

When interpreting a solicitation, this Court applies well-settled principles of contract interpretation.  Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004).  It is well established that a solicitation contains an ambiguity if it is susceptible to more than one reasonable interpretation.  See LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir. 2009); Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999); Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 725 (2009); Alliant Techsystems, Inc. v. United States, 74 Fed. Cl. 566, 576 (2007) (noting that interpretations must fall within a "zone of reasonableness" in order to constitute ambiguity).

The solicitation allowed offerors to submit their proposals via electronic means, but did not elaborate on the requirements for electronic transmission.  While the solicitation reminded offerors that internet and e-mail availability was intermittent in the operating environment in Afghanistan, and that file size should not exceed five MB, the solicitation did not inform offerors of any other restrictions in the Government's server or architecture for receiving e-mailed proposals.

The solicitation's lone sentence containing the requirement for electronic submission provided: "if the proposal is submitted via electronic means, files shall be 'Microsoft Office 2003 (Word and/or Excel) or PDF format only.'" AR 1132.

The parties attribute different meanings to the term "format," and dispute whether a zip file is itself a format or something else -- a utility, protocol or transmission feature. GMT claims that a zip file is a file compression utility and analogizes a zip file to packaging that is separate from the underlying file format such as Microsoft Office Word or Excel. Thus, in Plaintiff's view, the solicitation permitted e-mail transmission of PDF and Word files packaged in compressed or zipped files -- because zip files are not a "format."

The Army claims that the solicitation prohibited the use of compressed or zipped files because they are a type of file format, and the solicitation restricted formats to Microsoft Office 2003 (Word or Excel) or PDF format. The Army posits that the "format" of a file "refers to the manner in which the information in the file can be accessed by the operating system," and that formats are identified by three-letter suffixes after the file name, such as ".xls" or ".doc" or ".pdf." Because a zip file has its own three-letter suffix, ".zip" and because zip compression is sometimes described as a zip format, the Army viewed the "zip format" as being prohibited by the solicitation's requirement that proposal files were to be submitted in "Microsoft Office 2003 (Word or Excel) or PDF format only."

Here, neither party's interpretation of the solicitation is unreasonable. The different perspectives of the parties and the loose usage of the term "format" in both technical and common parlance contributed to the differing interpretations. As the experts acknowledged, a zip file can be referred to as a "format," and zip files bear a suffix (.zip), just as Word, Excel and PDF formats do. In sum, there is this legitimate debate about the nature of zip files, which calls into question the meaning of the term "format" in the solicitation, thereby rendering the solicitation ambiguous.

Having concluded that an ambiguity exists here, the Court must determine whether the ambiguity is latent or patent. Metric Constructors, 169 F.3d at 751. An ambiguity is latent if it is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care. Linc Gov't Servs. v. United States, 96 Fed. Cl. 672, 708 (2010) (citing Input/Output Tech., Inc. v. United States, 44 Fed. Cl. 65, 72 n.10 (1999)). Under the rule of contra proferentem, a latent ambiguity is resolved against the Government as drafter of the solicitation. Id. at 708-09; see also Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997) (reh'g denied) ("More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of contra proferentem."). A patent ambiguity, in contrast, is one that is obvious, gross, or glaring. NVT Techs., Inc. v. United States, 54 Fed. Cl. 330, 336 (2002) (citation omitted). When a solicitation contains a patent ambiguity, the offeror has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

For the purpose of distinguishing between patent and latent ambiguities, the United States Court of Appeals for the Federal Circuit has explained:

When determining whether contract language is patently ambiguous, the language must be placed at a point along a spectrum of ambiguity.  There is a grey area between the point along this spectrum at which a document requires more exacting language and that at which additional detail will add nothing but worthless surplusage.

Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 414 (Fed. Cir. 1988) (internal citations omitted).  When contract language falls within this "grey area," it cannot be patently ambiguous.  Id.; ITT Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 189 (1999).

The ambiguity here -- the varying interpretations of the requirement that electronic files be "Microsoft Office 2003 (Word and/or Excel) or PDF format only" -- falls within the grey zone of ambiguity.  As the parties' interpretations have evidenced, the term "format" is susceptible to different meanings in technical parlance and in the context of transmitting e-mail files.  Format can, as Plaintiff contends, refer to Word, Excel, or PDF files and not to a zip utility, or, using the term format more broadly as Defendant does, a zip file can be described as a zip format.  Because the ambiguity here arises from the technical interpretation of a single term and not an apparent conflict on the face of the solicitation, the ambiguity is latent -- not so glaring or obvious that it would give rise to a duty to inquire.

Where a contract has a latent ambiguity, under the rule of contra proferentem, the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable.  Metric Constructors, 169 F.3d at 751; Oenga v. United States, 96 Fed. Cl. 479, 511 (2010); Fort Vancouver Plywood, 860 F.2d at 414; Linc Gov't Servs., 96 Fed. Cl. at 708-09.

Here, Plaintiff's interpretation is eminently reasonable.  Because the solicitation restricted proposal files to the Microsoft Office 2003 (Word and/or Excel) or PDF format, and the use of zipped files would not have changed the format of the proposal files, it was reasonable for GMT to assume that it could submit its proposal in PDF or Word format attached to an e-mail using zip files.  The parties' experts agreed that the use of zipped files did not alter the format of the documents placed into the files.  Tr. 15-16, 44, 86-87.  Rather, when a computer user compresses files, the files maintain their Excel or PDF character.  Professor Gill analogized the compression process to folding of a piece of paper.  He stated:

> [I]f this page were the solicitation, essentially what a compression utility would be doing is folding it up.  So if I fold it up, then it can go into a smaller envelope. Now, I can't read this, and so this is compressed, and it is part of a means of transmission for the electronic information. If then somebody uncompresses it, it is analogous to unfolding it.

Defendant's expert agreed.  Mr. Perez stated:

> It's like the doctor said, I do agree with him, it's like folding.  I usually tell the guys that I talk to . . . . it's like an envelope.  The envelope has a limitation, so you've got to take the envelope and fold your letters to fit inside the envelope, then you seal it and send it off. . . .

Tr. 86-87.

GMT's interpretation of the solicitation also comported with common trade practice and usage. The use of zip files is extremely common in the world of electronic communications and is a common feature of modern desktop environments. Tr. 17-18, 63. The Questions and Answers in the solicitation recommended that electronic submissions not exceed five megabytes. AR 1132. Zipped files are commonly used in the commercial marketplace to reduce the size of large file transfers. Tr. 18-19. As such, GMT reasonably used zipped files as a common commercial tool to shrink its proposal files.

The Army argues that GMT's interpretation is unreasonable in light of the Army's internal policy restricting the e-mailing of zip files. Def.'s Reply 15-16. However, this policy has never been published to the public or to offerors. Tr. 82, 120. In 2006, the Army issued a NETCOM TECHCON Implementation Memorandum ("email security policy"), providing a list of attachment types that were to be filtered from e-mail due to the risk of computer viruses and malware. AR 2694-99. This security policy required that e-mail traffic originating outside of the Army's network be scanned and stripped of a list of over 50 attachment types, including .zip attachments. AR 2696-98.

The Army states that because the policy has been in place for over five years and is "representative of the type of policy that a reasonable contractor doing business with the Army would be aware of," the burden is on the offerors to know that policy. Def.'s Proposed Findings 17–18. The Army's application of this policy would impose far too heavy a burden on offerors. It is fundamental that compliance with a policy that was not disclosed in the solicitation cannot be imposed as a solicitation requirement. "Making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition." Gentex Corp. v. United States, 58 Fed. Cl. 634, 652 (2003) (quoting Dubinsky v. United States, 43 Fed. Cl. 243, 259 (1999)). While offerors were warned in the solicitation that due to "current operating environment in Afghanistan . . . internet and e-mail availability is intermittent," this did not put offerors on notice that the Army was going to strip compressed file attachments from e-mailed proposals. "[Contractors] are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents." States Roofing Corp. v. Winter, 587 F.3d 1364, 1372 (Fed. Cir. 2009) (quoting Blount Bros. Const. Co. v. United States, 346 F.2d 962, 973 (Ct. Cl. 1965)).

Because GMT reasonably interpreted the solicitation to permit submitting its proposal files via e-mail and PDF or Word documents packaged in zip files, the Army's rejection of that transmission and last minute insistence on a mechanism that delayed GMT's submission was arbitrary and capricious.

The Army's wholesale abandonment of the solicitation's responsiveness criteria before evaluating proposals heightens the arbitrariness of the treatment GMT received.[5] The Army

_____

[5] This solicitation was unusual in that it delineated threshold "responsiveness" evaluation criteria. AR 1143. However, the concept of responsiveness of a bid applies to sealed bidding to ensure that award is made to a bid which complies in all material respects with the solicitation. See FAR 14.301(a).

permitted offerors to depart from what had been stated in the solicitation as mandatory responsiveness evaluation criteria.

The solicitation expressly stated that the contracting officer, prior to evaluation by the SSEB, would "verify that each proposal meets the requirements of the solicitation <u>for the purpose of determining responsiveness</u>."   AR 1143 (emphasis added).   The first listed requirement was verification that the offeror's proposal was not late.  <u>Id.</u>  Thus, the solicitation clearly made timely submission of proposals part of its mandatory threshold responsiveness determination.   The Army decided to waive all responsiveness criteria for all offerors and memorialized this determination in formal memoranda signed by the contracting officer, SSEB Chairperson, and an Assistant Command Judge Advocate.  AR 3049-57.  Although the Army waived the solicitation's stated responsiveness criteria for other offerors, the Army refused to waive one of the solicitation's stated "responsiveness" criterion, timeliness, for GMT.  This unequal treatment was quintessentially arbitrary and capricious.

## GMT is Entitled to Injunctive Relief

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest.  <u>See</u> <u>Gentex</u>, 58 Fed. Cl. at 654; <u>Hawpe Constr., Inc. v. United States</u>, 46 Fed. Cl. 571, 582 (2000).  No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others."  <u>FMC Corp. v. United States</u>, 3 F.3d 424, 427 (Fed. Cir. 1993).

Because GMT has succeeded on the merits of its case, this factor weighs in GMT's favor.  GMT has also suffered irreparable harm.  This Court has repeatedly held that a protestor suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.  <u>See</u> <u>CRAssociates, Inc. v. United States</u>, 95 Fed. Cl. 357, 390–391 (2010); <u>Serco, Inc v. United States</u>, 81 Fed. Cl. 463, 501–02 (2008); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 52 Fed. Cl. 826, 828 (2002); <u>United Int'l Investigative Servs. v. United States</u>, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); <u>Bean Dredging Corp. v. United States</u>, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").  Here, GMT has demonstrated that it will suffer irreparable harm if injunctive relief is not provided because its full proposal was never evaluated -- only those portions of its proposal which arrived before the deadline (after the zip files were reorganized) were evaluated.

In considering whether the balance of the hardships tips in favor of a protestor, a court must balance the potential harm to the protestor of not granting the injunction against the potential harm to both the Government and the awardees should the injunction be granted.  <u>ES-KO, Inc. v. United States</u>, 44 Fed. Cl. 429, 435 (1999).  The Army argues that it will be harmed if GMT's proposal must be reevaluated.  The NAT contracts have already been awarded, and the Army claims there are insufficient personnel available to conduct a reevaluation of even one proposal.  In a declaration dated September 7, 2011, Contracting Officer Van Dyke testified:

> The Bagram Regional Contracting Center ("BRCC"), Bagram Afghanistan, is inadequately manned to continue the source selection. To date, 2/3 of the source selection team have redeployed. With current manning, we are stretched to satisfy the mobilization and beginning of the period of performance for the NAT contract. In addition, the current staff has additional transportation requirements to support. At this time there is no relief from those projects that can be focused on further source selection processes.

Van Dyke Decl. ¶ 4 (Sept. 7, 2011).

The Court recognizes that the current Army staff in Afghanistan cannot be diverted from crucial mission responsibilities. See Van Dyke Decl. ¶ 16. However, while the original proposal evaluation team may no longer be available, there is no bar to convening a new evaluation team to evaluate GMT's proposal. Contracting Officer Van Dyke testified that the price analyst has been redeployed to Rock Island, Illinois and files would have to be transferred there for a price evaluation in any event. Id. ¶ 7. There is no reason why GMT's technical evaluation could not similarly be transferred outside Afghanistan to be performed by contracting personnel elsewhere. While the responsibility determination may require local input, it appears from the record here -- including the prior [            ] debarment inquiries -- that the Army has personnel devoted to responsibility-type assessments. As such, the record indicates that military efforts in Afghanistan need not be adversely impacted in the event of a reevaluation of GMT's proposal.

Finally, the Court finds that an injunction will serve the public interest, noting that "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) (citing United Int'l Investigative Servs., 41 Fed. Cl. at 323).

## GMT Is Entitled to Recover Wasted Bid and Proposal Preparation Costs

GMT requests award of its bid and proposal costs. Under the Tucker Act, this Court "may award any relief that the court considers proper," including declaratory and injunctive relief and bid and proposal preparation costs. 28 U.S.C. § 1491(b)(2). This provision of the Tucker Act, "through use of the permissive 'may,' provides the Court of Federal Claims with discretion in fashioning relief." PGBA, L.L.C. v. United States, 389 F.3d 1219, 1226 (Fed. Cir. 2004). While the Tucker Act does not preclude monetary damages if injunctive relief has been granted, the Court takes into account "the facts and circumstances of the particular case" in exercising its discretion whether to award both injunctive relief and bid and proposal preparation costs. See CNA Corp. v. United States, 83 Fed. Cl. 1, 11 (2008).

Bid and proposal preparation costs are a form of reliance damages which are properly awarded when costs have been wasted. See, e.g., Centech Group, Inc. v. United States, 79 Fed. Cl. 562, 564 (2007) (finding that the protestor may be entitled to bid and proposal preparation costs "if it can demonstrate that such costs were wasted"). Because the Court grants GMT's request for injunctive relief, and GMT will have the opportunity to compete using the proposal it already submitted, the Court declines to award full bid and proposal preparation costs, as those

costs may not have been wasted.  However, the Court awards GMT those bid and proposal costs expended in reorganizing the proposal and resending the proposal on April 8 to eliminate zip files.  Because the Army had recommended that e-mailed proposal submissions not exceed five MB, Mr. Evans reorganized the proposal sections and attachments contained in the compressed (zipped) files into separate e-mails with attachments that approximated five MB in size, splitting approximately 80 files to meet these file size requirements.  Mr. Evans then re-transmitted GMT's proposal, consisting of over 100 individual Word and/or PDF files, by attaching those files directly to several batches of e-mails.  The record demonstrates that GMT and Mr. Evans put in a yeoman's effort to reorganize the proposal into individual unzipped files hours before the deadline in an attempt to timely submit GMT's proposal.  This effort was never contemplated by the solicitation and should not have been necessary.  As such, the Court awards GMT bid and proposal costs expended on April 8, 2012, in reorganizing and retransmitting its proposal.

## ORDER

1.  GMT's Motion for Judgment on the Administrative Record is **GRANTED**.

2.  The Court **GRANTS** Plaintiff's request for a declaratory judgment and injunctive relief as follows:

    a.  The Court hereby declares the Army's refusal to evaluate GMT's full proposal under solicitation No. W91B4N-11-R-5000, to have been arbitrary capricious, and in violation of the FAR, the Competition in Contracting Act, and the terms of the solicitation.

    b.  The Army, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, be and they are hereby ordered to evaluate GMT's full proposal in accordance with statute, regulation, and a reasonable exercise of discretion.  Such an evaluation, including if necessary, any discussions and a contract award, shall be completed within eight weeks of the date of this decision, absent good cause shown.  Prior to commencing such an evaluation, the Army may require GMT to provide a declaration that the proposal documents to be evaluated are the same as those GMT sent to the Army prior to the proposal deadline.

3.  The Court **GRANTS IN PART** Plaintiff's request for bid and proposal preparation costs, limited to costs expended in reorganizing GMT's proposal and retransmitting GMT's proposal on April 8, eliminating the zip files.  These costs may include the time and expenses of Mr. Evans and any other employee or consultant of GMT who participated in the effort, but may not include attorney's fees.

4.  Defendant's Cross-Motion for Judgment on the Administrative Record is **DENIED**.

5.  Prior to the release of this opinion to the public, the parties shall review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information.  The parties shall file proposed redacted versions of this decision by **March 28, 2012**.

6.  The Clerk is directed to enter judgment on the AR in favor of Plaintiff consistent with this opinion.

<u>s/Mary Ellen Coster Williams</u>
**MARY ELLEN COSTER WILLIAMS**
**Judge**